**Robert BURNS, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 64, 2008.**

Supreme Court of Delaware.

Submitted: Jan. 21, 2009.
Decided: April 20, 2009.
Corrected: May 4, 2009.

Nicole M. Walker and Santino Ceccotti (argued), Esquires, Office of the Public Defender, Wilmington, Delaware; for Appellant.

Elizabeth R. McFarlan (argued) and Danielle J. Brennan, Esquires, Department of Justice, Wilmington, Delaware; for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

Robert Burns, the defendant below, appeals from a Superior Court final judgment of conviction of three counts of Second Degree Rape, two counts of Second Degree Unlawful Sexual Contact, and one count of Continuous Sexual Abuse of a Child. On appeal, Burns argues that the Superior Court: (1) abused its discretion by denying his motion for a mistrial after the victims' father made an outburst before the jury; (2) erroneously denied his request to conduct an *in camera* review of the victims' therapist records; and (3) abused its discretion by refusing to provide the jury access to the victims' video-taped statements.

We conclude that the Superior Court did not abuse its discretion either in denying Burns' mistrial motion or in refusing to provide the jury access to the victims' video-taped statements. We are constrained to conclude, however, that the Superior Court erroneously denied Burns' request for an *in camera* review of the victims' therapist records. Absent such an *in camera* review, the record, in its current form, does not enable us to decide whether or not the convictions should stand. We therefore affirm in part, and remand to the Superior Court for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2006, the Ames family was hosting a birthday party for twelve year-old Sara Ames.[1] When Sara's sister, Tina Ames—who was then fourteen years old—saw Burns, her uncle, at that party, she recalled several occasions four to six years earlier when Burns had inappropriately touched her. Several days later, Tina asked Sara if Burns had ever touched her inappropriately. Sara responded affirmatively. Thereafter, Tina told a friend that Burns had touched her inappropriately. The friend's mother learned of Tina's allegations, and encouraged Tina to tell her parents. Tina and Sara wrote a note to

---

1. The State and Burns have agreed to the use of pseudonyms for the minor victims and their family.

their mother, Susan Ames, disclosing that when they were younger and had spent the night at their aunt's home, Burns would come into their bedroom and "touch" them.

On the morning of April 10, 2006, Susan Ames found the note after the girls had left for school. Susan then went to the girls' school, and told school officials about the note. Susan's husband, Richard Ames, was then contacted. Richard left work and met his wife at the school. The girls were removed from class and taken to meet their parents, who then took their children home and promptly called the Delaware State Police. State Trooper Joshua Giddings, who responded to the Ames' call, spoke with the girls' parents and was told of the accusation contained in the girls' note.

Based on Giddings' initial report, Detective Millard Greer was assigned to investigate the case. Detective Greer spoke with the girls' parents and asked them not to discuss the facts of the case with their children. Greer also arranged, in accordance with State Police procedure, for the girls to be interviewed separately by forensic child interviewers at the Children's Advocacy Center ("CAC") at the A.I. DuPont Children's Hospital.

Susan and Richard Ames did not discuss the case with their children. They did, however, ask the girls to prepare notes on all incidents where Burns allegedly touched them inappropriately, to aid them to recount what had occurred, at their CAC interviews. Each girl separately prepared a set of notes. Tina told her interviewer that while she slept in the guest bedroom at her aunt's home, Burns had touched the outside of her vagina on five to ten occasions. Sara told her interviewer that Burns had penetrated her vagina with his fingers between eight and ten times. Sara could not recall where all those incidents occurred, but said that

Burns inappropriately touched her at least once in the guest bedroom, and at least once in each of her two cousin's bedrooms. After the interviews, the girls destroyed their notes.

On May 22, 2006, Burns was arrested by the State Police. On July 24, a grand jury indicted Burns on five counts of Second Degree Rape as to Tina Ames, five counts of Second Degree Rape as to Sara Ames, and one count of Continuous Sexual Abuse of a Child as to each girl. Before trial, Burns moved to compel production, or alternatively an *in camera* inspection, of Tina and Sara Ames' therapist records. The trial judge took the motion under advisement.

The trial began on January 3, 2007. The next day, the State called Richard Ames as a witness. During direct examination, the prosecutor questioned Ames about how he had learned that Burns sexually abused his daughters. Mr. Ames responded as follows:

Q: Who was giving you information at that point?

A: My only sources of information were [Tina, Sara] and Susan. Q: Were you asking questions to get that information?

A: *I sure was. I wanted to know whether he stuck his penis in her vagina.* (emphasis added).

While responding to the prosecutor's second question, Richard Ames raised his voice, leaned forward in his chair and pointed toward Burns. Defense counsel immediately objected, and the trial judge excused the jury.

After the jury left the room, Burns moved for a mistrial. The trial judge informed the attorneys that because it was nearly 11:30 a.m., she would excuse the jury for lunch and ponder how best to address the situation. The jury was then

brought back into the courtroom. The judge instructed them to not discuss the case with anyone, and excused them for lunch.

After the lunch break, and before the jury returned to the courtroom, the trial judge informed counsel that although she found Richard Ames' outburst to be "calculated" and "intent[ional]," the outburst was not "calculated to in any way undermine the integrity of the court process." Accordingly, the trial judge denied Burns' mistrial motion, and ruled that a cautionary instruction was adequate to cure any prejudice. The jury was then brought back into the courtroom, and the trial judge gave the following instruction:

> Ladies and gentlemen of the jury, before the recess there was a moment where tensions ran high and voices got loud. And that was not an appropriate way to express one's self in a courtroom; the witness has been so advised. Please do not allow yourself to be swayed by any emotion in this case. Your responsibility is to decide this case based upon the facts, the evidence, the testimony, any documents, the items that are introduced, and apply the law to that. And you are not, by your oath, to be swayed by any considerations other than the facts of the case and the evidence and the law. So I would instruct you to disregard the emotional outburst and to consider only the evidence in your deliberations in arriving at a verdict.

After this instruction was given, the trial continued without further incident.

On January 5, after hearing counsel's arguments, the trial judge denied Burns' pre-trial motion to compel production of the victims' statements to their therapists, or (alternatively) to conduct an *in camera* review of those records. The court also denied Burns' motion to introduce the videotapes of Tina and Sara Ames' CAC interviews into evidence. Those videotapes

were played for the jury during the trial, however.

On January 10, 2007, the jury convicted Burns of three counts of Second Degree Rape, two counts of Second Degree Unlawful Sexual Contact (as a lesser included offense of Rape), and one count of Continuous Sexual Abuse of a Child, all in relation to Sara Ames. The jury was "hung" on one count of Continuous Sexual Abuse of a Child, but it acquitted Burns of two counts of Second Degree Rape and two counts of Second Degree Unlawful Sexual Contact, all in relation to Tina Ames.

After trial, Burns moved for a new trial or judgment of acquittal. He claimed, *inter alia,* that the Superior Court had erred by denying: (1) his motion for a mistrial after Richard Ames' courtroom outburst, (2) his request for an *in camera* review of the girls' therapy records, and (3) his request to introduce the girls' CAC interviews into evidence. The Superior Court denied Burns' motion for acquittal or a new trial, and on January 18, 2008, sentenced Burns to forty-one years imprisonment, suspended after thirty-five years for two years probation.

This appeal followed. On November 12, 2008, a panel of this Court heard oral argument. Thereafter, the Court directed the parties to address two supplemental questions: (1) the range of appropriate remedies where a witness for the State intentionally commits an outburst in the presence of the jury; and (2) the applicability of the United States Supreme Court decision in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The parties thereafter filed supplemental briefs.

### ANALYSIS

In Part I of this Opinion, we address Burns' claim that the Superior Court abused its discretion by denying his mo-

tion for a mistrial after the girls' father's courtroom outburst. In Part II, we address Burns' claim that the Superior Court abused its discretion by denying his request to introduce the victims' CAC interviews into evidence. Lastly, in Part III, we decide whether the Superior Court abused its discretion by denying Burns' request to review *in camera* the victims' therapy records.

## I. The Superior Court Did Not Abuse Its Discretion By Denying Burns' Motion for a Mistrial After the Father's Outburst.

We begin with Burns' challenge to the Superior Court's denial of his motion for a mistrial made immediately after Richard Ames' courtroom outburst. The trial court denied that motion, and instead issued a curative instruction. Balancing the *Taylor v. State*[2] factors—the nature, persistency, and frequency of the witness' outburst; the likelihood of prejudice to the jury; the closeness of the case; and the mitigating effect of a curative instruction—the court reasoned that a curative instruction would adequately cure any prejudice to Burns.[3] The reasons were that: (i) Mr. Ames' outburst was not accusatory, but rather was an expression of his own state of mind; (ii) because the jury understood that child molestation cases are very emotional for the victims and other witnesses, it was not likely to be misled by an emotional display by the victims' father; (iii) the curative instruction was properly given; and (iv)

the jury's consideration of the evidence was not affected by the father's outburst, as evidenced by the rendering of different verdicts as to each victim.[4]

On appeal Burns claims that the trial court erroneously misweighed the *Taylor* factors in denying a mistrial. The father's outburst was prejudicial, Burns argues, because it improperly suggested that Burns may have "stuck his penis" in the victims' vaginas, and also because of other events that occurred in the trial. Burns emphasizes that: (i) the father's testimony directly preceded that of the victims, and cast the victims in a more sympathetic light; (ii) the trial judge told Burns' attorney to "be quiet" after his objection to Richard Ames' outburst; and (iii) several witnesses during the trial requested breaks, because they would cry while testifying. Burns also claims that the prosecutor's closing argument accentuated the prejudice created by Richard Ames' outburst.[5]

The third *Taylor* factor is not in dispute: both sides agree that this case was close, because the absence of physical evidence and the age of the events in question made the outcome depend on a "credibility contest" between Burns and the victims.

As to the fourth *Taylor* factor, Burns claims that the two hour delay between the father's outburst and the court's curative instruction to the jury rendered that instruction wholly ineffective. Anything short of an immediate and explicit curative instruction that Richard Ames' outburst

---

2. 690 A.2d 933, 935 (Del.1997).

3. *State v. Burns,* 2007 WL 2677064, at *5–6 (Del.Super.Sept.11, 2007).

4. *Id.* at *6.

5. Specifically, Burns points to: (i) the prosecutor referencing Trooper Giddings' testimony that for him this investigation was a difficult emotional experience; (ii) her statement that "there are adults that don't know how to

handle sexual abuse" rationalized the father's outburst; and (iii) the prosecutor's statement that "the only person responsible for the hurt and the pain and the emotional trauma that you witnessed in this courtroom, the only person responsible for that is the defendant...." Burns argues that these factors, taken together, had the impermissible effect of improperly vouching for the complainants' credibility, and thus misled and confused the jury.

was intentional, Burns argues, would be wholly inadequate.

Finally, in his supplemental memorandum Burns urges that the *only* proper remedy for the outburst was to grant a mistrial. Even if not, Burns argues that what occurred in this specific case was sufficiently egregious as to require a mistrial.

The State responds that the *Taylor* factors were properly weighed and that the Superior Court's curative instruction was sufficient to cure any prejudice, because the outburst was an isolated incident and was not accusatory or conclusive. The State argues that the father's outburst expressed only his state of mind at an early point in the investigation, and there was no prejudice to Burns, because he was not being charged with having "stuck his penis" into either of the victims.

The State also argues that it was unlikely that the jury would be misled or prejudiced. That the jury acquitted Burns on multiple charges shows that the jury rationally considered the evidence presented at trial, unaffected by the outburst. And, although the third *Taylor* factor (the closeness of the case) concededly weighs in Burns' favor, the State contends that the trial judge gave the jury a curative instruction as soon as practicable.

Lastly, in its supplemental memorandum, the State resists a *per se* rule requiring a mistrial whenever a State's witness engages in a calculated outburst, because a range of remedies is available to a trial court in such circumstances. The alternatives include doing nothing, admonishing the witness, holding the witness in contempt, giving the jury a curative instruction, and (in rare cases) declaring a mistrial. The State argues that the trial judge properly exercised her discretion by delivering an adequate and effective curative instruction that obviated any need for a mistrial.

These contentions raise two issues. First, did the trial judge abuse her discretion in applying the *Taylor* factors? Second, where (as here) a witness' outburst is calculated and intentional, is a mistrial the only proper remedy? We address these issues in reverse order.

### A. An Intentional Outburst by a Witness for the State Does Not Per Se Require a Mistrial.

Because "a trial judge is in the best position to assess the risk of any prejudice resulting from trial events," we will reverse the denial of a motion for a mistrial "only if it is based upon unreasonable or capricious grounds."[6] Granting a mistrial is an extraordinary remedy, warranted "only when there is 'manifest necessity'"[7] and "no meaningful and practical alternatives."[8] In determining whether a witness' outburst was so prejudicial that the refusal to grant a mistrial constituted an abuse of discretion, or deprived the defendant of a substantial right, we consider and balance four factors.[9] To reiterate, they are: (1) "the nature, persistency, and frequency of the witness's outburst"; (2) "whether the witness's outburst created a likelihood that the jury would be misled or prejudiced"; (3) "the closeness of the case"; and (4) "the curative or mitigating action taken by the trial judge."[10]

In support of his claim that a purposeful outburst by a State's witness required the

---

6. *Revel v. State*, 956 A.2d 23, 27 (Del.2008) (citations omitted).

7. *Chambers v. State*, 930 A.2d 904, 909 (Del. 2007) (citations omitted).

8. *Dawson v. State*, 637 A.2d 57, 62 (Del.1994) (citing *Bailey v. State*, 521 A.2d 1069, 1077 (Del.1987)).

9. *Taylor v. State*, 690 A.2d 933, 935 (Del. 1997).

10. *See id.*

trial judge to grant a mistrial, Burns relies on case law from other jurisdictions.[11] Burns also argues that as a policy matter, this Court should adopt a *per se* rule mandating a mistrial where a state witness engages in a calculated outburst. According to Burns, such a rule would decrease the frequency of calculated outbursts (and the resulting prejudice to defendants) by motivating the State to impress upon its witnesses the serious consequences of a calculated outburst.

The State responds that given the many forms a witness' intentional outburst might take, any *per se* rule would be inappropriate. Instead, this Court should defer to the trial judge's decisions on courtroom management, as it traditionally has, and permit the trial court to tailor an appropriate remedy for a witness' outburst.[12] The State distinguishes the cases cited by Burns, and relies upon decisions finding no trial court abuse of discretion in denying a motion for a mistrial after a witness' spontaneous emotional outburst.[13]

Neither party has presented case law that is directly on point. Burns cites no case holding that a trial court abused its discretion by denying a motion for a mistrial to rectify an intentional witness' outburst. And, the cases cited by the State all involved spontaneous emotional outbursts. The outburst by Richard Ames was not. There is no precedent for a *per se* rule that would overturn the well-established principle in Delaware that "the trial judge is in the best position to assess whether a mistrial should be granted, and may exercise his discretion in deciding whether to grant a mistrial."[14] For that reason, and because Burns advances no persuasive policy reason to change the law, we adhere to the rule that, whether a witness' outburst should result in a mistrial is an issue to be analyzed within our established legal framework.

B. *The Superior Court Properly Applied the Taylor Factors To Conclude That a Curative Instruction Was Adequate.*

■ That brings us to the next issue, which is whether the trial judge, in the

11. *Lee v. Chicago Transit Auth.*, 152 Ill.2d 432, 178 Ill.Dec. 699, 605 N.E.2d 493, 507–08 (1992) (dictum) (noting because a civil plaintiff's third emotional outburst was not intentional, that the reviewing court would defer to the trial court's determination that the defendant was not prejudiced); *Commonwealth v. Santiago*, 425 Mass. 491, 681 N.E.2d 1205, 1210–11 (1997) (holding that where the victim's mother made a spontaneous emotional outburst, the trial judge did not abuse his discretion by denying the defendant's motion for a mistrial, and noting, in dictum, "[b]oth sides in a criminal trial have substantial latitude to try the case in their own way without significant interference so long as they engage in no calculated impropriety."); *Glenn v. State*, 205 Ga. 32, 52 S.E.2d 319, 321–22 (1949) (granting a new trial due to the victim's widow openly weeping while in the presence of the jury, and the trial court not giving any curative instruction; and noting that "[i]t is the right of every person accused of crime ... to have a fair and impartial trial, free from any demonstration or disorder of a nature calculated to prejudicially affect the jurors trying his case.").

12. *See Czech v. State*, 945 A.2d 1088, 1095 (Del.2008) ("It is well-settled that a trial judge is responsible for management of the trial and is vested with broad discretion to perform that function.").

13. *See, e.g., State v. Simmons*, 662 S.E.2d 559, 561–62 (N.C.Ct.App.2008) (no abuse of discretion in refusing to grant a mistrial where a victim of sexual assault, cried and screamed "How dare you do that to me!" at the defendant during trial); *State v. Jackson*, 506 S.W.2d 424, 427–28 (Mo.1974) (no mistrial required where the victim's widow exclaimed "Oh God! Why did you kill him? You didn't have to kill him!").

14. *Smith v. State*, 913 A.2d 1197, 1220 (Del. 2006).

exercise of her discretion, properly applied the four *Taylor* factors in this case. Burns insists that all four factors should have been weighed in his favor. The State disagrees, arguing that although the third factor—the closeness of the case—weighs in Burns' favor, the remaining three factors support the trial judge's decision to issue a curative instruction. We agree that the Superior Court did not abuse its discretion by denying Burns' motion for a mistrial.[15]

The first *Taylor* factor—"the nature, persistency, and frequency of the witness's outburst"[16]—weighs slightly in favor of the State. Richard Ames' outburst was an isolated event that lasted only a few seconds and was not persistent or frequent. Although intentionally directed toward Burns (a fact that favors Burns), the outburst was not calculated to disrupt the trial process. Nor did Ames' outburst go to the heart of the matter. Although Ames exclaimed that he wanted to know if Burns had had intercourse with his daughters, in fact there was no charge or claim that Burns' conduct involved penetrative intercourse. Therefore, Ames' outburst was not conclusive and did not accuse Burns of the exact conduct for which Burns was being prosecuted.[17]

The second *Taylor* factor is "whether the witness's outburst created a likelihood that the jury would be misled or prejudiced."[18] Ames' outburst was phrased in the form of a question, and referenced conduct that Burns was never actually accused of committing. The strongest evidence that the jury was not prejudiced was its final verdict: the jury convicted Burns on only some of the charges against him. Had the jurors been prejudiced against Burns, or misled as to the nature of the allegations against him, they would likely not have acquitted him of the Second Degree Rape and Second Degree Unlawful Sexual Contact charges in relation to Tina Ames. Therefore, the second *Taylor* factor strongly weighs in favor of the State.

As noted, the State concedes that the third *Taylor* factor—"the closeness of the case"[19]—weighs in favor of Burns. This case, like many child molestation cases, ultimately rests on the jury's evaluation of the parties' credibility. The fourth *Taylor* factor—"the curative or mitigating action taken by the trial judge"[20]—weighs strongly in favor of the State. The trial judge immediately excused the jury after

---

**15.** We summarily dispose of Burns' cursory arguments that he was prejudiced by (i) the judge telling his trial attorney to "be quiet" after Richard Ames' outburst, (ii) the incidents where witnesses became extremely emotional on the witness stand, and (iii) the prosecutor's reference in her closing statement to "the emotional trauma that [the jury] witnessed in this courtroom." None of those events were objected to at trial, nor are they the subject of this appeal, and Burns did not present those issues in the context of a claim of cumulative error. Therefore, these arguments are waived and we do not further address them.

**16.** *Taylor*, 690 A.2d at 935.

**17.** *See Taylor*, 690 A.2d at 935 (noting that in an alleged sexual abuse case, the jury would not be influenced by an outburst by the victims' grandmother shouting "You, you!" at the defendant, because the jury would understand that that child molestation case was emotionally charged); *see also Ashley v. State*, 798 A.2d 1019, 1022–23 (Del.2002) (holding that a spectator's outburst that the defendant had killed another person previously required a mistrial in a murder trial, because that outburst went to the heart of the matter the defendant was being tried for, and could not be remedied by a curative instruction).

**18.** *Taylor*, 690 A.2d at 935.

**19.** *Id.*

**20.** *Id.*

Richard Ames' outburst. After a two hour lunch break, the jury returned to the courtroom and promptly received a curative instruction.

Burns argues that no curative instruction could have undone the damage that Richard Ames' outburst caused. Alternatively, he claims that even if the court's curative instruction would be adequate if given immediately, the two hour delay rendered it ineffective. Neither claim has merit. Burns' argument that no curative instruction could be adequate rests on his contentions that an intentional witness outburst *per se* requires the trial court to declare a mistrial, and that the other *Taylor* factors weigh in his favor—positions we have already rejected. Burns "cannot [show how a two hour delay], without more, unfairly prejudiced him in the eyes of the jury when the instruction itself was properly designed to cure any prejudice."[21] Thus, the fourth *Taylor* factor also weighs in favor of the State.

Because three of the *Taylor* factors weigh in favor of the State and only one weighs in favor of Burns, Burns has failed to establish that the trial judge abused her discretion by denying his motion for a mistrial after the victims' father's outburst.

## II. The Superior Court Did Not Abuse Its Discretion By Refusing to Admit Videotapes of the Victims' CAC Interviews into Evidence.

■ Burns next attacks the trial judge's refusal to admit into evidence the videotapes of the victims' CAC interviews. The trial judge reasoned that allowing the jury

to review those videotapes during their deliberations would improperly emphasize the statements in those videotapes over all in-court testimony.[22] The court therefore adhered to the principle that admitting a witness' prior out-of-court statements into evidence under 11 *Del. C.* § 3507 "should be the exception, rather than the rule."[23]

Burns argues that in refusing to admit the CAC videotapes into evidence, the trial court abused its discretion because the videotapes were admissible under 11 *Del. C.* § 3507, and there were highly critical and documented inconsistencies in the two victims' accounts. Burns suggests that because the trial court did not engage in a balancing test, the court effectively ruled without adequately considering whether those videotapes should be admitted into evidence.

The State responds that under *Flonnory v. State*[24] the default rule is that Section 3507 statements must not be admitted into evidence and given to the jury, unless both parties agree to admit the statement or unless the jury, while deliberating, requests to see or hear the Section 3507 statements again.[25] The State argues that because neither exception applied, the trial court properly exercised its discretion in barring the Section 3507 statements as evidence.

■ A single issue emerges from the parties' contentions: was it an abuse of discretion for the trial judge to deny the admission of the CAC videotapes into evidence, where neither factor weighing in favor of admission was present? We re-

---

21. *See Michaels, et. al. v. State*, 970 A.2d 223, 230, 2009 WL 684142, at *5 (Del. Mar.17, 2009) (citing *Garvey v. State*, 873 A.2d 291, 300 (Del.2005) (holding that a "significant" delay in delivering a curative instruction does not render that instruction ineffective in curing prejudice to the defendant)).

22. *State v. Burns*, 2007 WL 2677064, at *9–10.

23. *See id.* (quoting *Flonnory v. State*, 893 A.2d 507, 525 (Del.2006)).

24. 893 A.2d 507 (Del.2006).

25. *See Flonnory*, 893 A.2d at 527.

view evidentiary rulings for abuse of discretion,[26] and find no abuse of discretion here.

■ Admitting a witness' prior out-of-court statement into evidence is disfavored and generally should occur only if one of two specified circumstances is present.[27] Because neither circumstance was present here, the trial judge acted well within her discretion by denying Burns' request to admit the CAC interviews into evidence.

### III. The Superior Court Abused Its Discretion By Refusing to Conduct an In Camera Review of the Victims' Therapy Records.

That brings us to the final issue, which is whether the trial judge erred by denying Burns' request to conduct an *in camera* review of the victims' therapy records.

Before trial, Burns moved under Superior Court Criminal Rule 17[28] to compel production of Tina and Sara Ames' therapy records. The Superior Court deferred argument on that motion until after the beginning of trial. Burns argued that the therapist's notes (excluding any diagnosis and any medical or counseling records not related to this case) were necessary for impeachment purposes because of alleged inconsistencies between the victims' trial testimony and their CAC interviews. Burns asked the Superior Court to conduct an *in camera* review of the victims' therapy records to determine whether disclosure of those records was necessary to protect his Sixth Amendment Confrontation right. The Superior Court denied that request, stating:

> First, I think that based on the representations that have been made thus far, you're essentially asking the Court to go on a fishing expedition. And as far as I can see, the possibility there might be some contradiction is mere speculation. This is not a case where there is evidence that the victim has recanted, expressed doubt about the identification of the perpetrator, or there's any indication that either victim suffers from a mental condition that would affect their ability to recall and relate events of what occurred. The [c]ourt, under case law, is required to balance the privilege versus the right to confrontation. And I think that in this case the showing that has been made does not meet a threshold that would justify disregarding the privilege between a patient and the therapist allowed under the law. Secondly, this privilege under the law does not appear

---

26. *Manna v. State*, 945 A.2d 1149, 1153 (Del. 2008).

27. *See Waterman v. State*, 956 A.2d 1261, 1264–65 ("... the 'default' rule is that written or tape or video-recorded § 3507 statements should *not* be admitted into evidence as separate trial exhibits that go with the jury into the jury room.... The trial judge ... ha[s] discretion to depart from this default rule when in his judgment the situation so warrants (e.g., where the jury asks to rehear a § 3507 statement during its deliberations or where the parties do not object to having the written or recorded statements go into the jury room as exhibits.")).

28. Superior Court Criminal Rule 17(c) provides:

> For production of documentary evidence and of objects.—A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

to be different in its equivalence to the other privileges. If this were an adult sex case where the victim had talked with her husband and related the events that happened, even if he had made notes for potential civil litigation, I don't think that the Court would disregard that privilege. If the victim had consulted with her priest or clergy and had shared information that was relating to this event, I don't think that we would disregard that privilege. And if she spoke to an attorney she had hired to pursue civil litigation, I don't think that we would disregard that privilege. There is nothing in the law that changes the equivalence that this privilege between therapist and patient should be afforded, excepting the case law which requires the court to balance, as I said. Having made that balance, I find that there is an insufficient showing to overrule the privilege and to intrude into that relationship at this juncture.

On appeal, Burns argues that he made the showing required under *State v. Block*[29] and *State v. Wood*[30] for the issuance of a subpoena, returnable to the court, for any factual information in the victims' therapy records.[31] Burns claims that having made the requisite showing, he was entitled to an *in camera* review of those records, followed by a Superior Court determination of whether those records should be disclosed to him, and that the denial of an *in camera* review was an abuse of discretion. The State responds that the trial court properly balanced the victims' interest in maintaining their privilege against Burns' Confrontation Clause rights, and properly determined that neither an *in camera* review nor disclosure of the victims' therapy records was required.

After this case was argued before a panel of this Court, we requested, and the parties submitted, supplemental briefs addressing the implications of the United States Supreme Court's decision in *Pennsylvania v. Ritchie*.[32] Burns claims that *Ritchie* is on point and compels the conclusion that the Superior Court abused its discretion by not granting *in camera* review. Burns suggests that other state courts have applied the *Ritchie* framework in similar circumstances, and required the disclosure of privileged records to the trial court for *in camera* review. The State responds that (1) *Ritchie* is distinguishable because the subpoenaed records in that case were in the possession of a state agency, and not (as here) in the possession of a private party; and (2) Burns failed to make the requisite showing of materiality.

Two issues are presented. First, is the *Ritchie* framework applicable where the privileged information is held by a private organization? Second, what showing must a defendant make to establish entitlement to an *in camera* review of records, and did Burns make such a showing? For the reasons that follow, we hold that *Ritchie* applies and that Burns was entitled to an *in camera* review.

**29.** 2000 WL 303351 (Del.Super.Feb.18, 2000).

**30.** 2007 WL 441953 (Del.Super.Feb.1, 2007).

**31.** That line of cases requires that the defendant, when seeking to compel the disclosure of records from a private person or organization, must:

 (1) Identify precisely the records that he is seeking, and assert a compelling basis for the request, that satisfies the court that it is not a "fishing expedition" into the witness' medical or psychological history.

 (2) Attempt to procure the witness' consent for the release of the records.

 (3) Demonstrate to the court, with specificity, that the material sought is relevant and material to the defense.

*See, e.g., Wood,* 2007 WL 441953, at *5–6.

**32.** 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (Plurality Opinion).

### A. *Pennsylvania v. Ritchie Controls.*

 We review the Superior Court's denial of Burns' request for a Rule 17 subpoena for abuse of discretion.[33] Communications between a patient and therapist are privileged under D.R.E. 503(a).[34] That privilege is not an absolute bar to the disclosure of a witness' communication with her therapist, however. Where, as here, the privilege is invoked to bar discovery of potentially relevant evidence in a criminal proceeding, the trial court must balance the defendant's Confrontation Clause rights against the witness' privilege.[35]

In *Pennsylvania v. Ritchie*,[36] the United States Supreme Court reviewed the conviction of a father who had committed various sexual offenses against his daughter. After Ritchie was charged, the matter was referred to Children and Youth Services ("CYS"), a state agency.[37] During pretrial discovery, Ritchie served CYS with a subpoena seeking the disclosure of records relating to the charges against him. CYS refused to comply, claiming the records were privileged.[38] The trial judge

denied Ritchie's request to compel CYS to produce those records, and declined to review them *in camera*. On appeal, the Pennsylvania Supreme Court held that by denying Ritchie access to the CYS records, the trial court violated his Confrontation Clause rights.[39] The United States Supreme Court affirmed in part and reversed in part. Applying a Due Process Clause analysis, that Court held that Ritchie was entitled to an *in camera* review of the CYS records, but not to a direct review by his attorney.[40]

The State contends that *Ritchie* is inapposite because that case involved records held by a state agency. That is a distinction without a difference. Although *Ritchie* involved the disclosure of records in the possession of the State, nothing in the *Ritchie* Court's holding or analysis limits its application to records held by the State. Moreover, other jurisdictions have held that *Ritchie* applies to privately held records.[41] From the standpoint of the privilege holder it is immaterial whether the holder's therapy records are in the possession of a private party or the State. In

---

33. *See, e.g., United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (reviewing the grant of a pretrial subpoena *duces tecum* under Federal Rule of Criminal Procedure 17 for abuse of discretion). The Federal Rule of Criminal Procedure 17 is consistent with the Superior Court Criminal Rule 17.

34. D.R.E. 503(b) provides, in relevant part:

A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the *patient's* physical, mental or emotional condition ... among the patient, the patient's mental health provider, physician, or psychotherapist. ...

35. *See, e.g., State v. Wood,* 2007 WL 441953, at *4.

36. 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

37. *Id.* at 43, 107 S.Ct. 989.

38. *Id.* at 45, 107 S.Ct. 989.

39. *Id.*

40. *Id.* at 55–61, 107 S.Ct. 989.

41. *See, e.g., Commonwealth v. Barroso,* 122 S.W.3d 554, 558–61 (Ky.2003) (analyzing *Ritchie* and concluding defendants have a Confrontation right to review of privileged therapy records); *State v. Green,* 253 Wis.2d 356, 646 N.W.2d 298, 304 (2002) (applying *Ritchie* when records held by a third party); *Goldsmith v. State,* 337 Md. 112, 651 A.2d 866, 874–75 (1995) (holding that privileged documents held by a third party subject to *in camera* review during trial); *State v. Cressey,* 137 N.H. 402, 628 A.2d 696, 703–04 (1993) (same); *State v. Kelly,* 208 Conn. 365, 545 A.2d 1048, 1056 (1988) (holding that third party's possession of privileged records immaterial to *Ritchie* analysis).

either circumstance, the privilege holder has the identical interest in non-disclosure. Therefore, *Ritchie* applies here. Consequently, Burns, upon a proper showing, would have been entitled to a Superior Court *in camera* review of the victims' therapy records.

### B. Burns Made the Necessary Showing For An In Camera Review.

■■■■ The final issue is what showing must Burns make to be entitled to an *in camera* review? In *State v. Wood*, the Superior Court held that Superior Court Criminal Rule 17 requires the defendant to: (1) "identify precisely the records he or she is seeking, and assert a 'compelling basis' for the request"; (2) "attempt to procure the consent of the victim for release of the records, before resorting to Rule 17"; and (3) demonstrate to the court, "with specificity, that the information he or she is seeking is relevant and material to his defense." [42] If such a showing is made, the court will then conduct an *in camera* review.[43]

The State and Burns generally agree that the *Wood* framework should control, as do we. Burns claims, however, that he is required only to make a "plausible showing" that the information he is seeking is

relevant and material, rather than having to establish relevance and materiality with specificity. Relying on a footnote in *Ritchie*,[44] Burns points out the impracticability and unlikelihood of a defendant ever establishing with specificity the relevance and materiality of unknown records. In response, the State argues that requiring anything less than a specific showing of relevance and materiality would result in the Superior Court having to conduct an *in camera* review in nearly all cases. That would strain court resources and increase the reluctance of sexual assault victims to seek counseling, for fear that their therapy records will be routinely disclosed.

■■■■ We conclude that a defendant need only make a "plausible showing" that the records sought are material and relevant. Otherwise, the defendant would find it impossible in most cases to establish materiality and relevance with specificity. It does not follow that every defendant will automatically be entitled to an *in camera* review. Defendants must still establish specifically what kinds or categories of records they are seeking, and must articulate a compelling basis for the request. The Superior Court must also be satisfied that the defendant is not embarking on a "fish-

42. See *State v. Wood*, 2007 WL 441953, at *5–6.

43. *Id.* at *6.

44. *Ritchie*, 480 U.S. at 58 n. 15, 107 S.Ct. 989:

The Commonwealth also argues that Ritchie is not entitled to disclosure because he did not make a particularized showing of what information he was seeking or how it would be material. See Brief for Petitioner 18 (quoting *United States v. Agurs*, 427 U.S. 97, 109–110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense")). Ritchie, of course, may not require the trial court to search through the CYS file with-

out first establishing a basis for his claim that it contains material evidence. See *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (*"He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense"*). Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of Ritchie's request may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure. See *United States v. Bagley*, 473 U.S. 667, 682–683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Blackmun, J.) (emphasis added).

ing expedition"[45] into the witness' medical or psychological history. Moreover, the court may, where necessary, sanction defendants who abuse the Rule 17 process.

We conclude that Burns has established his entitlement to an *in camera* review of the factual information in Tina and Sara Ames' therapy records relating to the charges against him. Because Burns sought only the factual information contained in those therapy records, his request was sufficiently precise and narrow. He also has established a compelling justification that that information was needed for impeachment purposes. The crimes with which he was charged had occurred years before, there was no physical evidence, the victims had made arguably inconsistent factual statements, and as in most child molestation cases where there is no physical evidence, the case would turn largely on the jury's determination of credibility. Burns sought the victims' consent before filing his Rule 17 motion to compel. Although Burns did not specifically show any material inconsistent statements by the victims, he did articulate concerns that established a "plausible showing" that the records sought were relevant and material, namely, that: (i) the girls had prepared detailed notes of their alleged abuse and destroyed those notes after their CAC interviews, and (ii) the girls presumably had discussed their interviews at length with their therapist. Those facts plausibly show that if there were factual inconsistencies in the girls' accounts, those inconsistencies could be discerned only from an *in camera* review of the factual information contained in the girls' therapy records.

Because we find that Burns was entitled to an *in camera* review of the factual information in the victims' therapy rec-

ords, we conclude that the Superior Court abused its discretion by denying that request. We therefore remand this case to the Superior Court.

On remand that court must decide what remedy Burns is entitled to. Burns claims that on remand he is entitled to a new trial. The current record, however, does not enable us to decide that issue. *Ritchie* does afford us guidance. There, the United States Supreme Court remanded Ritchie's case to the trial court to conduct an *in camera* review:[46]

> ... to determine whether [the records in question] contain[] information that probably would have changed the outcome of his trial. If it does, he must be given a new trial. If the records maintained by CYS contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction.[47]

*Ritchie* requires a new trial only if information in the victim's therapy records would have changed the outcome of the trial. On remand, the Superior Court shall conduct an *in camera* review, and determine whether the information in the victims' therapy records would probably have changed the outcome of Burns' trial. If the Superior Court so finds, then it shall vacate the convictions and order a new trial. If, however, the Superior Court finds that the information would not have changed the outcome, then the convictions shall stand. In either case, the Superior Court shall report its findings to this Court within sixty days of the date of this Opinion.

### CONCLUSION

For the foregoing reasons, the Superior Court's denials of Burns' motions for a

---

45. *Wood,* at *5.

46. *Ritchie,* 480 U.S. at 58, 107 S.Ct. 989.

47. *Id.*

mistrial and to admit videotapes of the victims' CAC interviews into evidence are affirmed. The case is remanded for an *in camera* review of the factual information in the victims' therapy records. Jurisdiction is retained under Supreme Court Rule 19(c), and the Superior Court shall report on the results of that *in camera* review within 60 days.